IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

ALHAJI JEWRU TOURAY,
NIAJA DACE,
KARAMO TOURAY,
BANGALLY TOURAY, and
ALHAGI KEBBA NJIE,

     Defendants.

CRIMINAL CASE NO.
1:20-CR-00103-TWT-LTW

## FINAL REPORT AND RECOMMENDATION AND ORDER CERTIFYING THIS CASE READY FOR TRIAL

This matter is before the Court on eleven motions filed by Defendants. [Docs. 21, 104, 113, 115, 117, 120, 121, 125, 127, 138, 190].[1] On May 4, 2021, the undersigned held an evidentiary hearing regarding a motion to suppress ([Doc. 125]) filed by Defendant Bangally Touray ("B. Touray").  After the hearing, B. Touray filed an additional brief in support of his motion ([Doc. 192]), and the Government responded ([Doc. 195]).  As will be discussed more below, the other motions currently before the Court do not require a hearing and can be decided on the briefs filed and the

---

[1] Defendants Alhaji Jewru Touray and Bangally Touray also filed Motions to Suppress Statements ([Docs. 23, 123]).  Because their motions seek to suppress custodial statements, the motions have been deferred to the District Judge for consideration.  [Docs. 132, 135].

documentary evidence submitted therewith.  For the reasons discussed below, the undersigned **RECOMMENDS** that the Motions be **DENIED**.  [Docs. 21, 104, 113, 115, 117, 120, 121, 125, 127, 138, 190].

## BACKGROUND

This background is drawn from the parties' briefs, the documentary evidence, and the evidence at the hearing.  To the extent that there are any conflicts regarding the facts of this case, they are discussed below in the legal analysis.

### A.    The Flights

On December 12, 2018, Homeland Security Investigations ("HSI") agents observed Defendant Alhaji Jewru Touray ("A.J. Touray") and Defendant Niaja Dace at Hartsfield-Jackson International Airport in Atlanta, Georgia.  A.J. Touray and Dace were talking and attempted to board a plane together, but an airline gate agent temporarily stopped Dace due to a ticketing issue.  Eventually, A.J. Touray and Dace both boarded United Airlines Flight 1900, which was destined for San Francisco, California.  That same day, agents located two checked bags under the name "Jewru Touray" for United Airlines Flight 1900.  After a narcotics-detecting canine alerted to the odor of drugs coming from the bags, agents obtained a search warrant for the bags, which led to the discovery and seizure of approximately $73,975 in U.S. currency

2

concealed within the bags.

When HSI Special Agent Matthew DeVane saw A.J. Touray boarding the flight in Atlanta, he had previously had an opportunity to review A.J. Touray's alien file ("A-file"), which contained an immigration judge's order of removal dated March 21, 2007. The file identified A.J. Touray as an alien to be removed to The Gambia. The A-file additionally contained an original version of an I-205 form, which indicated A.J. Touray was removed from the United States on April 30, 2007. Criminal records show that, prior to being removed, A.J. Touray had been convicted of felony possession of marijuana on February 19, 2002.

On May 12, 2019, Defendant Bangally Touray ("B. Touray") went to John F. Kennedy International Airport in New York City, New York ("JFK"), where he was scheduled to take a flight to Brussels, Belgium, and then from Brussels to Banjul, Gambia. See [Doc. 184 at 16]. Previously, on March 26, 2019, B. Touray was stopped at Hartsfield-Jackson International Airport prior to a flight to Phoenix, Arizona, with a final destination of Reno, Nevada. See [id. at 25]. When stopped in Atlanta, B. Touray had over $60,000 in U.S. currency in his possession and indicated that the money belonged to "Alhaji," which is the first name of Defendant A.J. Touray. [Id. at 25–26].

Upon learning of B. Touray's international flight, HSI Special Agent DeVane contacted HSI Special Agent Daniel Symonds at JFK and asked if Special Agent Symonds could perform an outbound border search on B. Touray. [Id. at 16]. Special Agent DeVane told Special Agent Symonds about B. Touray's alleged involvement in a money laundering conspiracy, including that B. Touray had previously been stopped with a large sum of money with him. [Id. at 19–20]. Special Agent DeVane specifically requested that Special Agent Symonds detain B. Touray's cellphone. [Id. at 16]. Special Agent Symonds coordinated with Customs and Border Patrol ("CBP") to set up an outbound border search of B. Touray. [Id. at 17]. CBP Officer John Costanza performed the outbound border search. [Id. at 5].

Officer Costanza approached B. Touray on the jetway after B. Touray had scanned his ticket and committed to taking the flight to Brussels. [Id. at 13]. Officer Costanza customarily informs passengers of the reporting requirements for bringing cash out of the U.S. when performing an outbound border search. [Id. at 6–7]. When asked if he was carrying U.S. currency, B. Touray told the officers that he was carrying $14,000. [Id. at 5–6]. When searched, officers found an envelope with a little more than $13,000, which was ultimately returned to B. Touray. See [id. at 17]. During the search, B. Touray appeared nervous, was sweating profusely, and had trouble

answering questions.  [Id. at 6].  Special Agent Symonds arrived after Officer Costanza had begun the search and received B. Touray's cellphone.  [Id. at 17].

B. Touray provided a passcode for the phone, but it did not work.  [Id. at 21–22].  When asked for the correct passcode, B. Touray declined to provide it.  [Id. at 22].  So, Special Agent Symonds sent the phone to Special Agent DeVane in Atlanta.  [Id. at 18].  According to Special Agent DeVane, it is a common practice at HSI for a phone to be sent to a different location from where it was initially seized in order to be searched.  [Id. at 27–28].  Special Agent DeVane also testified that he had greater knowledge of the case than agents in New York.  [Id. at 28].  On May 16, 2019, Special Agent DeVane used Cellebrite software to disable the phone's locking mechanism and perform a forensic search.  [Id. at 27].  During the search, Special Agent DeVane located a text message to a contact named "Ja3."  The message contained a photograph of a receipt for the $66,000.00 seized from B. Touray on March 26, 2019.  Special Agent DeVane did not have a search warrant authorizing the search of B. Touray's cell phone.

### B.     The Search Warrants

On February 7, 2020, Federal Bureau of Investigation ("FBI") Special Agent Steven Lee got a search warrant in the Northern District of California.  [Doc. 117-1

5

at 1].  In support of the warrant, Special Agent Lee provided an affidavit recounting many of the above facts along with a slew of other evidence.  See [id. at 7–10].  Special Agent Lee then recounted a September 11, 2019 interview with a confidential source ("CS"), during which the CS talked about marijuana trafficking with A.J. Touray between California and Georgia.  [Id. at 10–11].  The CS identified 1354 Springhill Drive, Pittsburg, California, as the "location where the CS and [A.J. Touray] had previously vacuum sealed bags of marijuana . . . that were destined for Atlanta."  [Id. at 11].  FBI agents "conducted a trash pull" at 1354 Springhill Drive and found vacuum seal bags with marijuana residue, receipts with A.J. Touray's name, mail with Dace's name, and 16 empty aerosol cans used to dispense expandable foam, which agents noted is often used to package narcotics.  [Id.].  On February 11, 2020, agents executed the search warrant on 1354 Springhill Drive, arresting A.J. Touray and recovering approximately 4.8 kilograms of marijuana, stacks of boxes with seams caulked with foam, and 3 pistols.

The day before the agents executed the warrant on 1354 Springhill Drive, they had a CS in communication with A.J. Touray regarding a marijuana sale that was going to take place at 7541 Hilltop Way, Atlanta, Georgia, the following day.  [Doc. 138-1 at 15–17].  On February 11, 2020, A.J. Touray provided the CS with contact information

for his "nephew" by giving the CS the telephone number "719-374-0955 for an individual identified as 'Pa Njie Mina.'" [Id. at 18].  The CS contacted "Pa Njie Mina," who said he "would be traveling to 'Hilltop,'" to meet the CS so the CS could "look at marijuana that was for sale at [A.J. Touray's] direction."  [Id.].  Later, "Pa Njie Mina" called the CS to say he had arrived at the residence, and at the same time law enforcement surveilling 7541 Hilltop Way saw a vehicle arrive and park in the garage. [Id. at 18–19].  When agents subsequently executed a search warrant for 7541 Hilltop Way, they found Defendant Alhagi Kebba Njie, another individual, 55.48 kilograms of marijuana, two guns, digital scales, and boxes with foam sealing that were consistent with the boxes found at 1354 Springhill Drive.  See [id. at 19].

The agents arrested Njie and seized a phone from his person.  On July 30, 2020, HSI Special Agent DeVane submitted an application and affidavit for a search warrant for six telephones seized at 7541 Hilltop Way, including the one found in Njie's front pocket.  [Doc. 138-1].  Magistrate Judge Alan J. Baverman authorized warrant 1:20-MC-1343 for the search of the telephones seized from 7541 Hilltop Way.  [Doc. 138-2].

### C.    The Superseding Indictment

On September 2, 2020, six defendants were charged in a Superseding Indictment

7

containing six counts: a money laundering conspiracy in violation of 18 U.S.C. § 1956; illegal re-entry in violation of 8 U.S.C. § 1326; a marijuana trafficking conspiracy in violation of 21 U.S.C. § 846; a substantive marijuana possession with intent to distribute count in violation of 21 U.S.C. § 841; and two possession of a firearm in furtherance of a drug trafficking offense counts in violation of 18 U.S.C. § 924(c). [Doc. 38].  Count One charges the money laundering conspiracy.  [Id. at 1–2].  Count Two charges A.J. Touray with illegal re-entry.  [Id. at 2].  Count Three charges the marijuana trafficking conspiracy.  [Id. at 2–3].  Count Four is a 924(c) count that relates to the firearms found at 1354 Springhill Drive in California.  [Id. at 3].  Count Five is the substantive marijuana possession with intent to distribute count.  [Id. at 4].  And Count Six is the 924(c) count that relates to the firearms found at 7541 Hilltop Way in Georgia.  [Id.].  The specific language used in the indictment is discussed below to the extent it is relevant.

## **LEGAL ANALYSIS**

Defendants' motions fall into two categories: motions to dismiss/sever certain counts ([Docs. 21, 104, 113, 115, 120, 121, 127]) and motions to suppress certain evidence ([Docs. 117, 125, 138, 190]).

A.     **The Motions to Dismiss/Sever**

Defendant A.J. Touray filed a Motion to Sever ([Doc. 21]) and an Amended Motion to Sever ([Doc. 104]), arguing the "illegal re-entry after deportation" charge in Count Two is improperly joined with the other counts of the indictment. A.J. Touray also moved to dismiss every count of the indictment, although it took five motions to do so. [Docs. 113, 115, 120, 121, 127].

1.     **The Motions to Sever**

Defendant A.J. Touray argues Count Two should be severed because the illegal reentry offense is "wholly unrelated" to the other charges. See [Doc. 21 at 3]. According to A.J. Touray, the illegal reentry offense cannot be charged with other crimes unless those crimes "could not have been committed but for the defendant's presence in the United States." [Id. at 4]. A.J. Touray further argues that, even if joinder is proper, the illegal reentry offense should still be severed because "there is no way to insure [sic] that jurors will not improperly conclude that where there is evidence of one negative trait that the defendant must have others." [Id. at 5]. Defendant A.J. Touray also argues, without explanation, that "the evidence of money laundering and illegal reentry[ ] may interact and prejudice defendant causing guilty verdicts on both

9

counts, where the evidence may not have been otherwise sufficient on one or both counts in separate trials." [Id. at 5–6].

Determining whether charges should be severed involves a two-step analysis. United States v. Hersh, 297 F.3d 1233, 1241 (11th Cir. 2002). First, the Court decides whether the charges are properly joined under Federal Rule of Criminal Procedure 8(a). Joinder is authorized if the offenses charged "are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). Crimes are "connected" within the meaning of Rule 8(a) "if the proof of one crime constitutes a substantial portion of the proof of the other." United States v. Montes-Cardenas, 746 F.2d 771, 776 (11th Cir. 1984). The Court "must construe Rule 8 broadly in favor of the initial joinder." Id. Second, even if counts are properly joined, the Court must decide if the joinder of the offenses "appears to prejudice a defendant." Fed. R. Crim. P. 14(a).

A.J. Touray is correct that, when "looking solely to the four corners of the indictment, there is no explicit connection between the groups of charges." United States v. Dominguez, 226 F.3d 1235, 1238 (11th Cir. 2000). But contrary to A.J. Touray's argument, there is no requirement that "the crimes charged *could not* have been committed but for" his presence in the United States. See [Doc. 21 at 3–4]

(emphasis in original).  Even if the offenses are "seemingly unrelated," they may be joined together if they are, in fact, "connected to the same general [criminal] scheme." United States v. Annamalai, 939 F.3d 1216, 1223 (11th Cir. 2019).  For example, in Annamalai, the defendant was charged with money laundering and conspiring to conceal a fugitive, among other offenses.  Id.  If A.J. Touray's argument were correct, the offenses in Annamalai could not have been joined unless the "conspiracy to money launder . . . could not have been committed but for the" fact that the defendant concealed a fugitive.  See [Doc. 21 at 3–4].  That is not what the Annamalai Court held. The Annamalai Court held that the offenses were properly joined together because Annamalai "committed a number of illegal acts" during his fraudulent scheme, and thus the offenses "arose out of and were connected to the same general fraudulent scheme."  Annamalai, 939 F.3d at 1223.

Likewise, here, the fact that A.J. Touray "could have" committed some of the crimes charged without being in the United States is irrelevant.  See [Doc. 104 at 2 n.1].  The reality is that A.J. Touray (allegedly) committed the offense of illegally reentering the United States in conjunction with his involvement in an alleged money laundering conspiracy.  As the Government explains, the first time A.J. Touray was "found in" the United States was when he "was traveling from Atlanta to San Francisco

11

on December 12, 2018 with more than $73,000 in his checked luggage that gave off the odor of narcotics." [Doc. 150 at 4–5]. That is, in proving A.J. Touray's connection to the money laundering that allegedly took place on December 12, 2018, the Government will introduce evidence that A.J. Touray was "found in" the United States, traveling from Atlanta to San Francisco. In other words, the Government's evidence of A.J. Touray's alleged involvement in the money laundering conspiracy will constitute a "substantial portion of the proof of the" illegal reentry offense. <u>See</u> <u>Montes-Cardenas</u>, 746 F.2d at 776. There does not need to be a "but for" connection between two offenses for them to be joined. If the offenses occur during and in connection with "the same general [criminal] scheme," they are properly joined for the purposes of Rule 8(a). <u>Annamalai</u>, 939 F.3d at 1223.

As mentioned above, even if two offenses *can* be charged together, the Court must still sever the counts if the joinder of the offenses "appears to prejudice a defendant." Fed. R. Crim. P. 14(a). A.J. Touray contends that he "faces prejudice in at least two different respects," but neither argument justifies severing Count Two. <u>See</u> [Doc. 21 at 5–6]. First, A.J. Touray argues a juror might "improperly conclude that where there is evidence of one negative trait that the defendant must have others." [<u>Id</u>. at 5]. This is true in literally every case where two different crimes are charged

12

together.  Under A.J. Touray's theory, two crimes could never be tried in the same case for fear that a jury might improperly decided the defendant committed a second offense based on the evidence of the first offense.  This would turn the rule favoring joinder on its head.  The Court "presume[s] that the jury [will] follow[ ] its instructions."  United States v. Stone, 9 F.3d 934, 940 (11th Cir. 1993).  To show incurable prejudice from joinder, Defendant A.J. Touray needs to persuade the Court that "the average juror could not follow [a] limiting instruction" and render a fair and impartial verdict.  See Annamalai, 939 F.3d at 1223 (quotation marks omitted).  A.J. Touray does not make such a showing.

A.J. Touray's second argument regarding prejudice is less persuasive than the first.  Despite arguing the two crimes are "wholly unrelated," A.J. Touray simultaneously expresses concern that a jury might "conflat[e] the evidence of money laundering and illegal reentry."  [Doc. 21 at 5–6]; see also [id. at 3].  If the crimes are as "unrelated" as A.J. Touray argues, there is no danger a jury could "conflate[e] evidence" regarding the different offenses.  The offenses at issue are not "wholly unrelated," as discussed above, because A.J. Touray allegedly committed illegal reentry while committing the money laundering offense.  But neither is there any real danger that a juror would be confused into thinking that proof of illegally reentering

13

the United States is *ipso facto* proof of money laundering or vice versa.  The crimes are distinct—even though the proof of each is interrelated in this case—and the Court presumes that the jury will follow its instructions.  See Stone, 9 F.3d at 940.  A.J. Touray does not demonstrate that severance is warranted under Fed. R. Crim. P. 14(a).  Based on the foregoing, the Motions to Sever ([Docs. 21, 104]) should be **DENIED**.

### 2.    Venue

A.J. Touray next argues that certain counts should be dismissed for improper venue, namely Count Two ([Doc. 113]) and Count Four ([Doc. 115]).  "Unless a statute or [the Federal Rules of Criminal Procedure] permit otherwise, the government must prosecute an offense in a district where the offense was committed."  Fed. R. Crim. P. 18.  Thus, determining the proper venue begins with the statute proscribing the criminal act.  Johnston v. United States, 351 U.S. 215, 220–21 (1956).

Count Two charges a violation of 8 U.S.C. § 1326, which makes it illegal for an alien who has been deported to thereafter be "found in" the United States.  [Doc. 38 at 2]; 8 U.S.C. § 1326(a).  As A.J. Touray correctly argues, Count Two must be brought "in the federal district where [he] was voluntarily found."  [Doc. 113 at 5].  But A.J. Touray mistakenly argues he was not "found in" the United States until he was arrested in the Northern District of California in February 2020.  See [id. at 6].  As noted by the

Government, HSI Special Agent DeVane was the federal immigration official that first "found" Defendant A.J. Touray in the United States, and that occurred in Atlanta on December 12, 2018.  [Doc. 146 at 3].  Thus, this District, the Northern District of Georgia, is the proper venue for Count Two.  See United States v. Clarke, 312 F.3d 1343, 1347 (11th Cir. 2002) (holding that a defendant is "found in" the United States when federal immigration officials first discovered his "illegal presence").  Based on the foregoing, the Motion to Dismiss Count Two ([Doc. 113]) should be **DENIED**.[2]

A.J. Touray also contends that Count Four should be dismissed for improper venue because the weapons at issue in that count were "found in California" and they have no "connection to the alleged conspiracy . . . in Count Three."  [Doc. 115 at 6–7].  Rule 18 provides that venue is proper "in *a* district where the offense was committed," clearly contemplating that multiple districts might provide a proper venue.  See Fed. R. Crim. P. 18 (emphasis added).  This comports with the long-standing rule that

---

[2] A.J. Touray also argues he should not be convicted of illegal reentry because "he believes that there was a manifest injustice" during his deportation proceedings. [Doc. 113 at 2–].  That is a defense to the offense charged, not a proper argument for a Fed. R. Crim. P. 12(b) motion.  See United States v. Salman, 378 F.3d 1266, 1268 (11th Cir. 2004) (holding that "there is no explicit authority to grant a pre-trial judgment as a matter of law on the merits under the Federal Rules of Criminal Procedure").

"where a crime consists of distinct parts which have different localities the whole may be tried where any part can be proved to have been done." United States v. Lombardo, 241 U.S. 73, 77 (1916).

The case of United States v. Miller, 387 F. App'x 949 (11th Cir. 2010) is instructive. There, the government established "that a portion of the drug-trafficking conspiracy took place in the Northern District of Georgia" because a co-conspirator "made connecting flights in Atlanta with cocaine stored inside her body." Miller, 387 F. App'x at 952. Thus, the Northern District of Georgia was the proper venue for a "924(c)(1) offense, even though the gun possession itself occurred in Florida," because "part of the underlying crime took [place] in Atlanta." Id.

A.J. Touray's argument that there is no connection between the firearms found in California and the drugs found in Atlanta is unavailing. A.J. Touray allegedly communicated with a confidential source about "traveling to Atlanta, Georgia to purchase marijuana and cocaine from [his] associates." [Doc. 138-1 at 14]. When the Atlanta location was searched, law enforcement found "approximately 55.48 kilograms of marijuana, and boxes in the garage with foam sealing and marijuana inside that were consistent with the boxes found [in California], where the Defendant was arrested." [Doc. 144 at 2]. Thus, even though the firearm(s) in Count Four were located in

California, the Northern District of Georgia is a proper venue because they were allegedly used in furtherance of a conspiracy that took place—in part—in this District. See Miller, 387 F. App'x at 952.  Based on the foregoing, the Motion to Dismiss Count Four ([Doc. 115]) should be **DENIED**.[3]

### 3.      Multiplicity

Defendant A.J. Touray moves to dismiss Counts Four and Six ([Doc. 120]) and Counts Three and Five ([Doc. 127]) on the grounds that they are multiplicitous.  "An indictment is multiplicitous if it charges a single offense in more than one count." United States v. Williams, 527 F.3d 1235, 1241 (11th Cir. 2008).  The test "is whether each [alleged offense] requires proof of a fact which the other does not."   See Blockburger v. United States, 284 U.S. 299, 304 (1932); see also Williams, 527 F.3d at 1241 (holding that whether an indictment is multiplicitous depends on whether "each count requires an element of proof that the other counts do not require").

---

[3] A.J. Touray argues the government will need to produce "proof that the defendant possessed the weapon[s] to promote or facilitate the underlying" drug trafficking offense.  [Doc. 115 at 6].  That is true, but irrelevant to the Motion to Dismiss.  The indictment charges that A.J. Touray possessed "a firearm in furtherance of a drug trafficking crime" ([Doc. 38 at 3]), and the Court cannot dismiss a count "on a determination of facts that should [be] developed at trial."   United States v. Torkington, 812 F.2d 1347, 1354 (11th Cir. 1987).

Counts Four and Six each charge violations of § 924(c)(1). But A.J. Touray is incorrect in arguing both charges rely on "the same underlying predicate offense." See [Doc. 120 at 4]. Count Four lists "the conspiracy to possess with intent to distribute marijuana described in Count Three" as its predicate offense; and Count Six lists "the possession with intent to distribute marijuana described in Count [Five]" as its predicate offense. [Doc. 38 at 3–4]. Thus, "each count requires an element of proof that the other" does not, namely proof of different underlying offenses. See Williams, 527 F.3d at 1241. Moreover, even if the two counts did rely on the same predicate offense, that does not mean they "are in fact one and the same offense," as A.J. Touray argues. See [Doc. 120 at 4]. The test for determining whether counts are multiplicitous is whether they require "an element of proof that the other counts do not require." Williams, 527 F.3d at 1241. There is no requirement that *every* element of proof be different.

A.J. Touray ignores the fact that Counts Four and Six involve different firearms found in different locations at different times. To be sure, "the simultaneous, undifferentiated possession of multiple firearms constitutes only one offense." United

States v. Hodges, 628 F.2d 350, 351 (5th Cir. 1980).[4]  But "where a defendant has possessed different weapons at different times or places, the government may treat them as separate units of prosecution and charge multiple counts."  United States v. Jones, 601 F.3d 1247, 1259 (11th Cir. 2010); see also United States v. McCrary, 643 F.2d 323, 326 (5th Cir. 1981) (holding that separate possessions "can be established by showing . . . that the weapons were stored in different places").  As the Government correctly argues, Counts Four and Six "charge the possession of different firearms possessed in different federal districts on opposite ends of the country."  [Doc. 147 at 3].  As such, Counts Four and Six are not multiplicitous and the Motion to Dismiss Counts Four and Six ([Doc. 120]) should be **DENIED**.  See Jones, 601 F.3d at 1259; McCrary, 643 F.2d at 326.

Defendant A.J. Touray also argues Counts Three and Five are multiplicitous. [Doc. 127].  Count Three charges a conspiracy "to knowingly and intentionally possess with intent to distribute controlled substances."  [Doc. 38 at 2–3].  Count Five charges the actual "possess[ion] with the intent to distribute a controlled substance."  [Id. at 4].

---

[4] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir.1981) (en banc), the Eleventh Circuit Court of Appeals adopted as precedent the decisions of the former Fifth Circuit issued before October 1, 1981.

"Conspiracy and the substantive offense that is the object of the conspiracy are separate and distinct crimes." United States v. Hernandez, 141 F.3d 1042, 1052 (11th Cir. 1998). A.J. Touray contends that Counts Three and Five are, in effect, still the same offense because Count Five mentions "aiding and [a]betting," but he cites no authority to support his novel position. See [Doc. 127 at 5]. To convict A.J. Touray of aiding and abetting the substantive offense, the Government must still prove "the substantive offense was committed by someone." United States v. Camacho, 233 F.3d 1308, 1317 (11th Cir. 2000). But even if no one committed the underlying substantive offense, A.J. Touray "still could have conspired with others to bring about the commission of the" offense. Hernandez, 141 F.3d at 1053.

In other words, Count Five requires a showing that either A.J. Touray or another Defendant *actually possessed*, with the intent to distribute, a controlled substance. Count Three only requires a showing that they *conspired* to do so, even if the substantive offense never actually occurred. Hernandez, 141 F.3d at 1053. The offenses require different elements of proof, therefore, Counts Three and Five are not multiplicitous. See Williams, 527 F.3d at 1241. Based on the foregoing, the Motion to Dismiss Counts Three and Five ([Doc. 127]) should be **DENIED**.

### 4.      Failure to State an Offense

Defendant A.J. Touray last moves to dismiss Count One on the grounds that it fails to state an offense.  [Doc. 121 at 4–14].  An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c).  A defendant may file a motion alleging a defect in the indictment, including a "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(v). "An indictment is considered legally sufficient if it: (1) presents the essential elements of the charged offense, (2) notifies the accused of the charges to be defended against, and (3) enables the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution for the same offense."  United States v. Schmitz, 634 F.3d 1247, 1259 (11th Cir. 2011) (quoting United States v. Jordan, 582 F.3d 1239, 1245 (11th Cir. 2009)).

"It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as those words fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished."  United States v. Garrett, 467 F. App'x 864, 867 (11th Cir. 2012) (citing Hamling v. United States, 418 U.S. 87, 117 (1974)); see also United States v. Critzer, 951 F.2d 306, 307-08 (11th Cir. 1992) ("The indictment is sufficient

if it charges in the language of the statute.").  An indictment that tracks the language of the statute must be accompanied by "facts and circumstances that will inform the accused of the specific offense, coming under the general description, with which he is charged."  Russell v. United States, 369 U.S. 749, 765 (1962) (citations omitted).  But an indictment does not have to "detail the factual proof that will be relied upon to support the charges."  United States v. Sharpe, 438 F.3d 1257, 1263 n.3 (11th Cir. 2006) (quoting United States v Crippen, 579 F.2d 340, 342 (5th Cir. 1978)).

The Court is limited to "reviewing the *face* of the indictment and, more specifically, the *language used* to charge the crimes."  Sharpe 438 F.3d at 1263 (quoting United States v. Critzer, 951 F.2d 306, 307 (11th Cir. 1992)) (emphasis in original).  A court must read the indictment "as a whole and give it a 'common sense construction.'"  United States v. Jordan, 582 F.3d 1239, 1245 (11th Cir. 2009).  The Court must ultimately determine whether "the factual allegations in the indictment, when viewed in the light most favorable to the government, [are] sufficient to charge the offense as a matter of law."  United States v. DeVegter, 198 F.3d 1324, 1327 (11th Cir. 1999) (quoting Torkington, 812 F.2d at 1354).  Ultimately, the question "is not whether the indictment might have been drafted with more clarity, but whether it

conforms to minimal constitutional standards." United States v. McGarity, 669 F.3d 1218, 1235–36 (11th Cir. 2012).

A.J. Touray first argues Count One "fails to allege or identify any 'financial transactions' that [he] agreed to conduct." [Doc. 121 at 5]. In fact, Count One unambiguously states that Defendant allegedly agreed "to knowingly conduct and attempt to conduct *a financial transaction* in and affecting interstate commerce, which transaction involved the proceeds of specified unlawful activity." [Doc. 38 at 1] (emphasis added). What A.J. Touray appears to be requesting is that the Government "detail the factual proof that will be relied upon to support the charge[,]" but that is not required to state an offense. See Sharpe, 438 F.3d at 1263 n.3. This is evident in the next section of his Motion, where A.J. Touray argues Count One is deficient because it does not list out "the specific charges or transactions to which he must defend." [Doc. 121 at 7–12].

A.J. Touray's argument regarding the alleged lack of specificity in the indictment is overstated. A.J. Touray repeatedly asserts "the indictment fails to identify a single co-conspirators [*sic*] nor provide [*sic*] any factual allegations related to the alleged conspiracy." [Id. at 8]; see also [id. at 13 (arguing the indictment "does not identify any alleged co-conspirators or participants or provide the time or location of

any alleged criminal activity or financial transactions").  In addition to A.J. Touray, Count One clearly identifies Dace, B. Touray, Karamo Touray, and Muhamadou Kamateh as co-conspirators.  [Doc. 38 at 1].  Likewise, Count One does not fail to "provide any factual allegations related to the alleged conspiracy," as A.J. Touray suggests.  See [Doc. 121 at 8].

Count One identifies a timeframe of less than 30 months, states that the offense occurred—at least in part—in the Northern District of Georgia, and clearly states that the financial transaction(s) at issue involved proceeds from "the felonious manufacture, receiving, concealment, buying, selling and otherwise dealing in a controlled substance"; that A.J. Touray "knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity"; and that "the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds."   [Doc. 38 at 1–2]. Additionally, the Court does not just consider Count One in isolation, as A.J. Touray would have it.  The indictment must be read "as a whole."  Jordan, 582 F.3d at 1245. When doing so, even more factual detail is evident.  Count Three alleges A.J. Touray was involved in a conspiracy to possess with the intent to distribute "100 kilograms or

more of a mixture and substance containing a detectable amount of marijuana." [Doc. 38 at 2–3].

In short, the indictment provides "facts and circumstances" that are sufficient to inform A.J. Touray of the specific money laundering conspiracy with which he is charged. See Russell, 369 U.S. at 765. Namely, Count One describes where the alleged conspiracy took place, informs A.J. Touray of the nature of the proceeds at issue, provides a clear timeframe, and lists numerous co-conspirators who were allegedly involved in the conspiracy. [Doc. 38 at 1–2]; see also United States v. Durrett, 524 F. App'x 492, 494 (11th Cir. 2013) (holding that a charge was sufficient because it "set forth the dates of the conspiracy, identified a co-conspirator, identified the location of the conspiracy, and identified [the defendant] as the person [allegedly committing the offense]"). Contrary to A.J. Touray's argument, there is nothing that prevents him from arguing "he lacked knowledge that the financial transactions allegedly engaged in were designed to conceal the unlawful source of the proceeds." See [Doc. 121 at 9]. That is a defense he can raise *at trial*, but the *indictment* does not need to "detail the factual proof that will be relied upon to support the charge[ ]" at trial. See Sharpe, 438 F.3d at 1263 n.3; see also Torkington, 812 F.2d at 1354 (noting that "a court may not dismiss an indictment . . . on a determination of facts that should have been developed

25

at trial").

A.J. Touray's last contention is that Count One "cannot act as a bar against any subsequent prosecution for the same offense" but this argument is based on his incorrect assertion that Count One "does not identify any alleged co-conspirators or participants or provide the time or location of any alleged criminal activity or financial transactions." See [Doc. 121 at 13]; see also [Doc. 38 at 1–2]. The case A.J. Touray cites, United States v. Knowles, 2 F. Supp. 2d 1135 (E.D. Wis. 1998), is readily distinguishable. See [Doc. 121 at 13]. In Knowles, the indictment was insufficient because the money laundering charge completely failed to allege that the defendant engaged in a financial transaction and further failed to allege that the financial transaction involved the concealment of proceeds from a specified unlawful activity. 2 F. Supp. 2d at 1138. The allegations in Count One—and the rest of the indictment— are a far cry from those in Knowles where the Government just nakedly alleged that the defendant "did knowingly conspire with other persons both known and unknown[ ] to commit money laundering." See [Doc. 38]; see also Knowles, 2 F. Supp. 2d at 1138. Count One is sufficient because it presents the essential elements of the charged offense, notifies A.J. Touray of the charge to be defended against, and enables him to "rely upon a judgment under the indictment as a bar against double jeopardy for any

subsequent prosecution for the same offense." See Schmitz, 634 F.3d at 1259. Based on the foregoing, the Motion to Dismiss Count One ([Doc. 121]) should be **DENIED**.

## B.    The Motions to Suppress

Defendants Dace and A.J. Touray move to suppress evidence obtained in the search of 1354 Springhill Drive and request a hearing regarding the motion pursuant to Franks.[5] [Docs. 117, 190]. Defendant B. Touray seeks to suppress evidence obtained via the border search of his cell phone. [Doc. 125]. Also, Defendant Njie seeks to suppress evidence obtained as a result of his arrest and the subsequent search of his phone. [Doc. 138]. The Court discusses each motion in turn.

### 1.    The Search of 1354 Springhill Drive

Defendant Dace moves to suppress the evidence obtained during the search of 1354 Springhill Drive on the grounds that "the individual who swore out the warrant application either intentionally made false statements or made his allegations with willful disregard of the true set of facts." [Doc. 117 at 1].[6] Specifically, Dace argues the warrant application "did not mention . . . that agents had been working with the CS

---

[5] Franks v. Delaware, 438 U.S. 154 (1978).

[6] Defendant A.J. Touray filed an "Adopted Motion to Suppress" that is simply a copy of Defendant Dace's motion. [Doc. 190].

for a lengthy period of time" and that "the affiant did not note whether the corroborated 'information' was important or merely tangential."  [Id. at 4].  Dace also argues "the affiant failed to note . . . that the trash pull may have been an illegal foray onto the curtilage of the property."  [Id. at 5].

Affidavits for warrants are presumptively valid.  United States v. Gamory, 635 F.3d 480, 490 (11th Cir. 2011).  If a defendant wishes to "challenge the veracity of an affidavit in support of a search warrant" she must first make "a 'substantial preliminary showing' that (1) the affiant deliberately or recklessly included false statements, or failed to include material information, in the affidavit; and (2) the challenged statement or omission was essential to the finding of probable cause."  United States v. Arbolaez, 450 F.3d 1283, 1293 (11th Cir. 2006) (quoting Franks, 438 U.S. at 155–56).  Omissions that are not reckless, but are instead negligent, or insignificant and immaterial, will not invalidate a warrant.  Madiwale v. Savaiko, 117 F.3d 1321, 1327 (11th Cir. 1997).  Furthermore, when material that is the subject of the alleged falsity or reckless disregard is set to one side and there remains sufficient content in the warrant affidavit to support a finding of probable cause, the warrant is valid.  Madiwale, 117 F.3d at 1326–27.

Dace argues the affiant "did not mention . . . that agents had been working with

the CS for a lengthy period of time" and contends this fact is important because agents were only able to corroborate information from the CS "where possible." [Doc. 117 at 4] (emphasis in original).  This argument is confusing because it appears to suggest that the agents should have verified information from the CS where not possible.  Dace also asserts that the information that had been corroborated "was of little importance when it came to [A.J.] Touray or the home on Springhill Drive," but that is incorrect. See [id.].  The CS identified 1354 Springhill Drive as the location where they "had previously vacuum sealed bags of marijuana" with A.J. Touray.  [Doc. 117-1 at 11]. FBI agents corroborated this information via a trash pull at 1354 Springhill Drive that revealed "numerous vacuum seal bags containing marijuana residue," receipts with A.J. Touray's name, and 16 empty aerosol cans used to dispense expandable foam—a substance "often used by drug traffickers to package narcotics in the hope that the narcotics will be harder to detect."  [Id.].

Thus, regardless of whether agents were able to verify other information provided by the CS, they were able to corroborate incredibly pertinent information that related directly to the subject property.  The affidavit appears to have contained no "omission", but whatever omission there may have been was, at best, insignificant and immaterial.  Moreover, even if the information from the CS were set aside, there would

be sufficient content in the warrant affidavit to support a finding of probable cause—namely, the information gathered during the trash pull and the rest of the investigation. [Doc. 117-1 at 2–12].   As such, Defendants are not entitled to a <u>Franks</u> hearing regarding the alleged "omission" of information regarding the CS.  <u>Madiwale</u>, 117 F.3d at 1326–27.

Dace also challenges the affiant's statements regarding the trash pull itself, but this argument fails for two reasons.  First, Dace's naked assertion that "the trash pull *may* have been an illegal foray on to the curtilage of the property" does not entitle her to "an evidentiary hearing to get to the bottom of whether the agents violated the Fourth Amendment."  <u>See</u> [Doc. 117 at 5] (emphasis added).  To be entitled to a <u>Franks</u> hearing, Dace must "make a substantial *preliminary* showing of deliberate falsity and omission."  <u>United States v. Barsoum</u>, 763 F.3d 1321, 1329 (11th Cir. 2014) (emphasis in original).  Her allegations "must be more than conclusory and must be supported by more than a mere desire to cross-examine."  <u>Id</u>. (quoting <u>Franks</u>, 438 U.S. at 171). Because Dace only argues the trash pull "may" have been illegal, she has not made the kind of substantial preliminary showing required to receive a <u>Franks</u> hearing.  <u>See</u> <u>Barsoum</u>, 763 F.3d at 1329.

Second, Dace's own argument demonstrates there was no false statement or material omission regarding the trash pull.  The only evidence Dace points to is discovery material where agents said the trash receptacles they searched were "on the street by the curbline."  [Doc. 117 at 5].  Dace then states, "Being <u>by</u> a curbline is not the same as being <u>on</u> publicly accessible land."  [<u>Id</u>.] (emphasis in original).  Dace, however, ignores the first part of the quote, which states that the trash receptacles were "**on the street**."  [<u>Id</u>.] (emphasis added).

This case is dissimilar to the authority relied on by Dace, <u>United States v. Tate</u>, 524 F.3d 449 (4th Cir. 2008).  In <u>Tate</u>, the defendant proffered *facts* that showed: "(1) the trash investigation took place . . . on a Thursday; (2) the trash was not to be picked up until the following Saturday; (3) on non-trash-pick-up days, the practice followed [by defendant] was to store trash in a trash container near the rear steps of the house which was not accessible from public areas without trespassing; (4) the backyard of [the] residence, in which the trash container was kept on non-trash-pick-up days, was fenced with a gate that was always locked; (5) [the agent] stated in a similar affidavit to obtain a search warrant offered *in another case* two months earlier that he had seized 'two trash bags easily accessible from the rear yard' and that the trash bags were found in 'a typical location for trash pick-ups and consistent to the location of neighbors'; (6)

31

in the affidavit *in this case*, the language was similar but did not include the last clause that the bags were found in 'a typical location for trash pick-ups and consistent to the location of neighbors'; and (7) the result of [the agent's] trash search was necessary to a showing of probable cause in this case." Tate, 524 F.3d at 455–56 (emphasis in original). With such a substantial showing, it is readily apparent that Tate was entitled to a Franks hearing. See Tate, 524 F.3d at 456–57.

In this case, Dace's "evidence" falls short of what was proffered in Tate. Dace simply provides speculation that the trash pull "may" have been illegal based on her misinterpretation of the agents' statement that they found the trash bins "on the street." See [Doc. 117 at 5]. That is not the kind of substantial preliminary showing required to receive a Franks hearing. See Barsoum, 763 F.3d at 1329. Based on the foregoing, the Motion(s) to suppress evidence obtained in the search of 1354 Springhill Drive and request for a Franks hearing ([Docs. 117, 190]) should be **DENIED**.

### 2. The Border Search

Defendant B. Touray raises three arguments relating to the forensic search of his cellphone. First, B. Touray argues the agents "did not have reasonable suspicion" to seize the phone. [Doc. 192 at 8]. Second, B. Touray argues the Government "has no authority to forensically search a phone that is leaving the country." [Id. at 10]. And

third, B. Touray contends that the search of the phone cannot "be considered a border search" because the phone was transported from New York to Atlanta before it was actually searched.  [Id. at 11].

Longstanding precedent holds that warrantless searches at international borders of the United States may be conducted without any suspicion of criminal activity. United States v. Santiago, 837 F.2d 1545, 1547 (11th Cir. 1988) (citing United States v. Ramsey, 431 U.S. 606, 619 (1977); United States v. Haley, 743 F.2d 862, 864 (11th Cir. 1984); United States v. Hernandez-Cuartas, 717 F.2d 552, 555 (11th Cir. 1983); United States v. Garcia, 672 F.2d 1349, 1353–54 (11th Cir. 1982)).  Defendant cites to non-binding authority holding that a border search of a cellphone requires reasonable suspicion, but there is no authority from the Eleventh Circuit imposing that standard. See [Doc. 192 at 5–8]; see also United States v. Vergara, 884 F.3d 1309, 1313 (11th Cir. 2018) (declining to address "whether reasonable suspicion was required for the [border] searches" of the defendant's cellphones).

Even assuming *arguendo* that the officers needed reasonable suspicion to seize and search B. Touray's cellphone, they met that standard.  Reasonable suspicion requires considerably less than proof of wrongdoing than the standard of a preponderance of the evidence or even the requirement for probable cause that evidence

33

of a crime will be found.  United States v. Tapia, 912 F.2d 1367, 1370 (11th Cir. 1990).

Reasonable suspicion merely requires a "particularized and objective basis for

suspecting the particular person" has committed a crime.  United States v. Cortez, 449

U.S. 411, 417 (1981).    The reasonable suspicion determination permits law

enforcement officials to "draw on their own experience and specialized training to

make inferences from and deductions about the cumulative information available to

them that 'might well elude an untrained person.'"  United States v. Arvizu, 534 U.S.

266, 273 (2002) (quoting Cortez, 449 U.S. at 418); United States v. Briggman, 931

F.2d 705, 709 (11th Cir. 1991).  Even if none of the suspect's actions are criminal on

their face, together they can provide trained police with reasonable suspicion.  United

States v. Lee, 68 F.3d 1267, 1271 (11th Cir. 1995).  Reasonable suspicion is also based

on the collective knowledge of the officers involved in the stop.  United States v.

Mikell, 102 F.3d 470, 475 (11th Cir. 1996) (citing United States v. Sokolow, 490 U.S.

1 (1989); United States v. Williams, 876 F.2d 1521 (11th Cir. 1989)).

    B. Touray glosses over the fact that less than 7 weeks before the border search,

he was stopped in Atlanta with approximately $66,000 in suspected drug proceeds.  See

[Doc. 184 at 25].  On the day of the search itself, B. Touray had a substantial amount

of money on his person—over $13,000.  [Id. at 17].  Additionally, during the search,

B. Touray appeared nervous, was sweating profusely, and had trouble answering questions.  [Id. at 6].  None of these facts are definitive proof of criminal activity, but the agents did not need proof of criminal activity.   The agents only needed a "particularized and objective basis for suspecting" that B. Touray had committed a crime, which they had.  See Cortez, 449 U.S. at 417.

B. Touray argues the agents had no reason to suspect "the cell phone he was carrying would have contraband or evidence on it," but this argument is unavailing.  In determining whether reasonable suspicion exists, law enforcement officers are entitled to rely "on their own experience and specialized training" to make inferences and deductions.  Arvizu, 534 U.S. at 273.  It does not take much "specialized training" to know a suspect's cellphone may contain evidence related to an alleged international drug trafficking and money laundering scheme.   B. Touray's argument that the Government "would have been able to secure a search warrant to seize and search [his] phone" misses the mark.  See [Doc. 192 at 8].  Even under the Ninth Circuit's more stringent border search standard, a warrant is not required.  See United States v. Cano, 934 F.3d 1002 (9th Cir. 2019); see also Vergara, 884 F.3d at 1311 (noting that "border searches never require a warrant or probable cause").  At most, all that was required was a reasonable suspicion, and as discussed above, the agents had that.

35

Even if the agents had lacked a reasonable suspicion, the Leon[7] good faith exception would apply.  The exclusionary rule "is not an individual right."  Herring v. United States, 555 U.S. 135, 141 (2009).  It is a "last resort" whose "sole purpose" is "to deter future Fourth Amendment violations."  United States v. Smith, 741 F.3d 1211, 1219 (11th Cir. 2013).  Suppression is necessary "only if the officers were dishonest or reckless" or if they "could not have harbored an objectively reasonable belief" the search was warranted.  See United States v. Martin, 297 F.3d 1308, 1313 (11th Cir. 2002) (quotation and citation omitted).  As mentioned above, B. Touray's argument hinges on a minority position that is contrary to the longstanding rule that border searches usually do not require any suspicion of illegal activity.  See Santiago, 837 F.2d at 1548.  Whatever its merits, there is no binding precedent in this Circuit or the Second Circuit—where New York is located—adopting that position.  The fruits of "a search conducted in reasonable reliance on binding precedent [are] not subject to the exclusionary rule."  Davis v. United States, 564 U.S. 229, 236–37 (2011).

B. Touray also cites to a case stating that the government has the authority to search people entering the country and then leaps to the conclusion that the government

---

[7] United States v. Leon, 468 U.S. 897 (1984).

must have "no authority to forensically search a phone that is leaving the country." [Doc. 192 at 10].  Binding precedent says otherwise.  See United States v. Hernandez-Salazar, 813 F.2d 1126, 1138 (11th Cir. 1987) (holding that "Congress may, consistent with the fourth amendment, authorize Customs officers to conduct warrantless searches of persons and property departing the United States on the basis of reasonable suspicion [of] a currency reporting violation").  Last, Defendant argues the border search ceased to be a border search when his phone was transported from New York to Atlanta.  [Doc. 192 at 11].  As Special Agent DeVane testified, it is a common practice at HSI for a phone to be sent to a different location from where it was initially seized in order to be searched.  [Doc. 184 at 27–28].  B. Touray points to no authority holding that such a practice is impermissible.  [Doc. 192 at 11].  Thus, even if B. Touray's argument were correct, the Motion to Suppress would be due to be denied because the Leon good faith exception would apply.  See Davis, 564 U.S. at 236–37.  Based on the foregoing, B. Touray's Motion to Suppress the search of his cellphone as part of a border search ([Doc. 125]) should be **DENIED**.

### 3.    The Search of Njie's Phone

Last, Defendant Njie "believes that law enforcement lacked the requisite level of constitutional cause to arrest him and seize the phone." [Doc. 138 at 3].  Njie further

argues the affidavit in support of the warrant to search his phone is deficient because "it only refers to Mr. Njie as being one of the individuals arrested during the" search of 7541 Hilltop Way and there is nothing else "connecting him to the Hilltop Way residence or the incriminating items that were found in the residence." [Id. at 4]. The undersigned addresses these arguments in turn.

An officer needs probable cause to conduct a warrantless arrest. United States v. Lyons, 403 F.3d 1248, 1253 (11th Cir. 2005). "Probable cause exists where the facts and circumstances within the collective knowledge of the law enforcement officials, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe an offense has been or is being committed." United States v. Blasco, 702 F.2d 1315, 1324 (11th Cir. 1983). "Probable cause is not a high bar." United States v. Delgado, 981 F.3d 889, 897 (11th Cir. 2020). All that is necessary is the mere "probability or substantial chance of criminal activity." Id. Whether probable cause to arrest exists depends on the totality of the circumstances. Lyons, 403 F.3d at 1253–54. If there is probable cause to arrest a person, then the person can be searched incident to the arrest. United States v. Robinson, 414 U.S. 218, 224 (1973) ("It is well settled that search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment.").

Njie's arrest was supported by probable cause.  On February 11, 2020, A.J. Touray was in telephone communication with a CS and told the CS he would provide the telephone number for his "nephew." [Doc. 138-1 at 18].  A.J. Touray then provided two phone numbers "for an individual identified as 'Pa Njie Mina.'"  [Id.] (emphasis added).  The CS communicated with this individual, who said he would "be traveling to 'Hilltop'" to meet with the CS to facilitate the sale of marijuana at A.J. Touray's direction.  [Id.].  When agents searched the 7541 Hilltop Way residence, they found Njie, another individual, well over 100 pounds of marijuana, digital scales, guns, $34,303 in bulk U.S. currency, an electric money counter, etc.  [Id. at 19].  Such evidence was enough for the agents to conclude that there was a "probability or substantial chance of criminal activity" at the 7541 Hilltop Way residence.  See Delgado, 981 F.3d at 897.

Njie's argument appear to be that the agents lacked probable cause because the "only" evidence he was involved in criminal activity is that he happened to be at a stash house with over 100 pounds of marijuana while a drug deal was taking place.  See [Doc. 138 at 4].  Njie ignores the fact that the CS was communicating with "Pa Njie Mina" to facilitate the drug deal.  [Doc. 138-1 at 18].  But even if the "only" evidence were Njie's presence at the stash house while the drug deal was happening, that would

have been enough probable cause to arrest him.  See United States v. Major, 341 Fed. App'x 549, 551 (11th Cir. 2009) (holding that it was "probable that [the defendant] was involved with the drug transaction because he was in [the] vehicle at the precise time and place [his companion] was scheduled to make a significant cocaine sale, an unlikely situation for an unknowing passenger merely along for the ride").  Because Njie's arrest was lawful, the search of his person incident to the arrest was lawful. Robinson, 414 U.S. at 224.

As with an arrest, a search warrant must be supported by probable cause, which exists "when the totality of the circumstances allows a conclusion that there is a fair probability of finding contraband or evidence at a particular location."  United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999).  An affidavit in support of a search warrant must "state facts sufficient to justify a conclusion that evidence or contraband will probably be found at the premises to be searched."  United States v. Martin, 297 F.3d 1308, 1314 (11th Cir. 2002) (citation omitted).  Courts do not "conduct a de novo determination of probable cause."  Massachusetts v. Upton, 466 U.S. 727, 728 (1984). The reviewing court's role is "only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant."  Id.  This is "a practical, commonsense decision," and courts are not to "interpret supporting affidavits

40

in a hypertechnical manner." United States v. Miller, 24 F.3d 1357, 1361 (11th Cir. 1994). Courts want "to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations." Id.; see also United States v. Robinson, 62 F.3d 1325, 1331 (11th Cir. 1995) (requiring the reviewing court to afford "great deference" to a judicial determination of probable cause). When reviewing an affidavit to determine if it contains probable cause, the entire affidavit must be read together "as a whole." See United States v. Reed, 700 F.2d 638, 641 (11th Cir. 1983).

Njie's assertions that there "is no evidence that he was involved in any criminal activity" and that "the affidavit [does not] indicate that [he] was the individual speaking to the confidential source about viewing marijuana" are inaccurate. See [Doc. 138 at 4]. The CS was given the telephone number "719-374-0955 for an individual identified as 'Pa Njie Mina.'" [Doc. 138-1 at 18]. When the CS contacted the person at that number, "Pa Njie Mina" told the CS to meet at "Hilltop" to "look at the marijuana that was for sale." [Id.]. When agents searched the Hilltop residence, they found Njie and over 100 pounds of marijuana. [Id. at 19]. The only other individual at the Hilltop residence was named Muhamed Bojang. [Id.].

Magistrate Judges can make "common-sense conclusions" in assessing probable cause. Illinois v. Gates, 462 U.S. 213, 231–32 (1983) (quoting United States v. Cortez, 449 U.S. 411, 418 (1981)). Using common sense, Magistrate Judge Baverman had a substantial basis for concluding that "Pa Njie Mina" was Njie. Because "Pa Njie Mina" used a phone to facilitate the drug transaction, Magistrate Judge Baverman had ample evidence to conclude there was a "fair probability of finding" evidence of criminal activity on Njie's phone. See Brundidge, 170 F.3d at 1352. Even if there was a defect in the search warrant—which there was not—the evidence obtained during the search of Njie's phone would be admissible under the Leon good faith exception. See [Doc. 164 at 5–6]. Based on the foregoing, Njie's Motion to Suppress the search of his cellphone as part of a border search ([Doc. 138]) should be **DENIED**

## CONCLUSION

For the foregoing reasons, the undersigned **RECOMMENDS** that Defendants' Motions ([Docs. 21, 104, 113, 115, 117, 120, 121, 125, 127, 138, 190]) be **DENIED**. There are no other pending matters before the Magistrate Judge, [8] and the

---

[8] As noted in footnote one above, Defendants A.J. Touray and B. Touray have also filed Motions to Suppress Statements ([Docs. 23, 123]) that have been deferred to the District Judge for consideration. [Docs. 132, 135].

undersigned is aware of no problems relating to the scheduling of this case.  **IT IS FURTHER ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

      **SO ORDERED, REPORTED, AND RECOMMENDED**, this __3__ day of September, 2021.

                _____
                LINDA T. WALKER
                UNITED STATES MAGISTRATE JUDGE